IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 85134-9-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JERMAINE RODREGUS FREEMAN, | |
| Appellant. | |

BOWMAN, A.C.J. — A jury convicted Jermaine Rodregus Freeman of first degree and second degree child molestation. The trial court found Freeman is a persistent offender and sentenced him to life without the possibility of parole (LWOP). Freeman argues that the court erred by excluding evidence of specific instances of the child's dishonesty, that the State improperly elicited inadmissible opinion testimony, and that cumulative error requires reversal. He also argues that his sentence under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981 (POAA), chapter 9.94A RCW, is unconstitutional and that we should remand for the trial court to strike the victim penalty assessment (VPA) from his judgment and sentence. We affirm Freeman's convictions and sentence but remand for the trial court to strike the VPA.

FACTS

Z.M. was born in June 2008. When she was around four years old, her mother, Natasha Wright, began dating Freeman. Later, Freeman intermittently

lived with Natasha,[1] Z.M., and Z.M.'s older brother, J.M. J.M. is about six years older than Z.M.

One night in February 2018 when Z.M. was nine years old, Freeman entered the children's[2] bedroom while they were sleeping and sexually assaulted Z.M. The next morning, Z.M. reported the incident to her mom, Natasha. She also told her friends, M.C. and L.D., and L.D.'s mother, Jeninne Ives. Ives immediately reported the incident to Child Protective Services (CPS). And Natasha "kick[ed] [Freeman] out of the house . . . [f]or a little bit." But CPS "screened out" the referral because there was "not enough information." And Freeman "eventually c[a]me back" to Z.M.'s home.

In June 2020, when Z.M. was 12 years old, Freeman knocked on Z.M.'s bedroom door while she was video calling and playing an online game with M.C. M.C. heard the knock, but Z.M. hung up when she told Freeman he could come in. Freeman then told Z.M. that he was leaving and asked for a hug. When they hugged, Freeman put his hand underneath Z.M.'s pants and underwear and slightly squeezed her buttocks. Just after Freeman left, Z.M. called M.C. back and told her what happened. M.C. then told her mother, Peggy Combs. Z.M. also told Natasha but felt she did not take it "seriously." That night, Z.M. stayed at M.C.'s house.

---

[1] We use the first names of the Wright family members when necessary for clarity and mean no disrespect by doing so.

[2] Z.M. and J.M. shared a bedroom at the time. They each had a twin bed, and their beds were side-by-side. J.M. testified that he is a "heavy sleeper" and that "yelling is the [only] sort of thing that would wake [him] up."

2

The next morning, Z.M. and Combs discussed that Freeman inappropriately touched Z.M. Combs then reported the incident to CPS. On Tuesday, June 23, CPS social worker Georgette Carter visited Z.M. at her house and began investigating. Natasha then sent Z.M. to stay with L.D.'s family. Z.M. told L.D. and Ives about Freeman's recent inappropriate conduct. On Friday, June 26, Ives also reported to CPS Z.M.'s disclosure about Freeman.

CPS then placed Z.M. with her oldest brother, Christian Wright, for a couple of weeks during its investigation until it was "safe" for Z.M. to return home to Natasha. CPS closed the case as "unfounded"[3] and referred the case to the Seattle Police Department. The State charged Freeman with first degree rape of a child, first degree child molestation as an alternative to first degree rape of a child, and second degree child molestation.

Before trial, the State moved to exclude testimony about Z.M.'s alleged reputation for untruthfulness. It also moved for an offer of proof about specific instances of Z.M.'s dishonesty that Freeman intended to introduce. Freeman asked to cross-examine Z.M. about "a prior false claim of sexual abuse against her brother," J.M. But Freeman admitted that Z.M. never told CPS she had been molested by her brother. Instead, someone else reported it to CPS, and Z.M. "ultimately denied" the allegations.

The trial court ruled the evidence was inadmissible because "there's no real foundation" that Z.M. made the comments, and they could not be sourced to

---

[3] Social worker Carter explained that "unfounded doesn't mean that [CPS] didn't believe the allegations."

her. The court also added it was hearsay and "irrelevant . . . that someone else said that she said something about her brother."

The case proceeded to trial in February 2023. Several witnesses testified, including Z.M., Natasha, J.M., Christian, M.C., Combs, L.D., Ives, CPS social worker Carter, and a Seattle police detective. After Carter's testimony, but before Z.M. or any of her family members testified, Freeman asked the trial court if he could "inquire of Natasha about prior instances of [Z.M.] telling lies about her family members." Freeman said Natasha would testify that Z.M. lied about her when she "denied [Z.M.] privileges," specifically "about physical abuse that [Z.M.] says Natasha has perpetrated against her that is not true." The court denied the motion, explaining it was "improper impeachment evidence" and "you just can't get into reputation that way."

M.C. testified about the night in June 2020 when she and Z.M. were on a video call and playing online games. When the prosecutor asked M.C. how she felt after Z.M. told her Freeman put his hand down Z.M.'s pants and squeezed her buttocks, M.C. testified that she was "worried for her and her safety and I was disgusted and appalled." During Ives' testimony, the prosecutor asked whether she felt Z.M. "would be safe going home to mom." Ives testified, "It's not mom but just the environment, not safe, no."

The jury acquitted Freeman of first degree rape of a child but convicted him of the alternative crime, first degree child molestation, and of second degree child molestation. At sentencing, the court found Freeman to be a persistent offender under the POAA. It determined that Freeman's 2001 conviction for

second degree rape of a child was his first "strike offense," and the current first degree child molestation of Z.M. conviction was his second strike offense. The court then imposed a mandatory LWOP sentence for the first degree child molestation conviction and a concurrent 116-month sentence for the second degree molestation conviction. The court found Freeman "is indigent," waived all nonmandatory legal financial obligations, and imposed only restitution and a $500 VPA.

Freeman appeals.

ANALYSIS

Freeman argues (1) the trial court violated his constitutional right to present a defense, (2) the State elicited inadmissible opinion testimony, (3) cumulative error requires reversal, (4) the POAA's two-strike provision for felony sex offenses is unconstitutional, and (5) we should remand for the court to strike the VPA. We address each argument in turn.

1. Right to Present a Defense

Freeman argues the trial court violated his constitutional right to present a defense by excluding testimony about Z.M.'s false allegations against J.M. and Natasha. We disagree.

Both the federal and state constitutions guarantee a criminal defendant the right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022). But the right is not absolute; a court may exclude irrelevant or otherwise inadmissible evidence to accommodate other legitimate interests in the

criminal trial process. *State v. Caril*, 23 Wn. App. 2d 416, 426, 515 P.3d 1036 (2022).

When a defendant asserts that an evidentiary ruling violated his right to present a defense, we engage in a two-part analysis. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). First, we review the court's evidentiary ruling for an abuse of discretion. *Id.* A court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.* at 799. Then, if we conclude the trial court's evidentiary ruling was not an abuse of discretion, we review de novo whether the ruling deprived the defendant of his constitutional right to present a defense. *Id.* at 797-98; *Jennings*, 199 Wn.2d at 59.

A. <u>Z.M.'s Alleged False Allegations against J.M.</u>

Freeman argues the trial court erred by refusing to allow him to cross-examine Z.M. about whether she falsely accused J.M. of molesting her. He asserts the testimony was admissible under ER 608(b) as a specific instance of Z.M.'s untruthfulness. We disagree.

Under ER 608(b), specific instances of a witness' conduct, introduced to attack their credibility, may, "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness." "In exercising its discretion, the trial court may consider whether the instance of misconduct is relevant to the witness's veracity on the stand and whether it is germane or relevant to the issues presented at trial." *State v. O'Connor*, 155 Wn.2d 335, 349, 119 P.3d 806 (2005).

6

Evidence is relevant if it tends to "make the existence of any fact of consequence more probable or less probable than it would be without the evidence." *State v. Darden*, 145 Wn.2d 612, 624, 41 P.3d 1189 (2002). "[E]vidence of a witness' prior false statement is not always relevant, particularly when that evidence is unrelated to the issues in the case." *State v. Lee*, 188 Wn.2d 473, 489, 396 P.3d 316 (2017); *see also State v. Harris*, 97 Wn. App. 865, 872, 989 P.2d 553 (1999) ("Generally, evidence that a rape victim has accused others is not relevant and, therefore, not admissible, unless the defendant can demonstrate that the accusation was false.").

Here, the trial court determined that it was "irrelevant to this case . . . that someone else said that [Z.M.] said something about her brother." It explained that the allegation could not be sourced to Z.M. because someone else made the CPS referral. And it pointed out that Z.M. in fact denied the allegation. In any event, Freeman's assertion that CPS "investigated" the allegation and found "nothing" is not evidence that the allegation was false. The court's ruling accurately assessed the nature of the of the evidence and does not amount to an abuse of discretion.

As to the second step of our inquiry, a defendant has no constitutional right to present irrelevant evidence. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). So, the trial court's ruling did not deprive Freeman of his constitutional right to present a defense.

B. Z.M.'s Alleged False Allegations against Natasha

Freeman also argues the court erred by excluding testimony from Natasha that Z.M. falsely accused her of physical abuse. He contends the court "improperly excluded the evidence as improper impeachment." We disagree.

Under ER 608(a)(1), a witness may testify about the character of another witness, but the evidence must be in the form of reputation testimony relating to the witness' "truthfulness or untruthfulness." To offer reputation testimony, a party "must lay a foundation establishing that the subject's reputation is based on perceptions in the community." *State v. Callahan*, 87 Wn. App. 925, 935, 943 P.2d 676 (1997). And the "community" must be "both neutral and general." *State v. Land*, 121 Wn.2d 494, 500, 851 P.2d 678 (1993). A witness' personal opinion is insufficient to lay a foundation. *Id.*

After CPS social worker Carter testified, Freeman asked to "inquire of Natasha about prior instances of [Z.M.] telling lies about her family members." Defense counsel explained that

> Natasha . . . would testify that [Z.M.] has lied specifically about her when she has been denied privileges or trying to get her in trouble, specifically about physical abuse that she says Natasha has perpetrated against her that is not true.

The trial court ruled that the testimony would be improper impeachment evidence and excluded it. Because Natasha would testify about specific instances of alleged misconduct rather than Z.M.'s general reputation for untruthfulness in the community, the trial court did not err.

On appeal, Freeman argues he offered the testimony "as specific instances of lying about abuse" under ER 608(b). But ER 608(b) provides that

specific instances of a witness' conduct may be inquired into "on cross examination of the witness." The instances "may not be proved by extrinsic evidence." ER 608(b). Freeman did not ask to cross-examine Z.M. about the evidence. Instead, he offered the testimony as extrinsic evidence through Natasha. So, the trial court did not abuse its discretion by excluding the evidence.[4]

And excluding the evidence did not violate Freeman's right to present a defense. When analyzing whether the trial court violated the right to present a defense, we balance the State's interest in excluding the evidence against the defendant's need for the information sought to be admitted. *Jennings*, 199 Wn.2d at 65. When the defendant "has an opportunity to present his theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of [his] constitutional rights." *State v. Ritchie*, 24 Wn. App. 2d 618, 635, 520 P.3d 1105 (2022).

Here, Freeman's theory of the case was that Z.M. was not a credible witness. At trial, Freeman had an opportunity to present that theory and impeach Z.M.'s credibility. For example, Freeman introduced evidence that CPS originally "screened out" the 2018 report that Freeman sexually assaulted Z.M. for lack of information. And he cross-examined Z.M. about her inability to remember certain

---

[4] At oral argument, Freeman argued the evidence was admissible under ER 608(b)(2). But ER 608(b)(2) permits inquiry into specific instances of conduct when the instances concern the "character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified." Here, no witness testified about Z.M.'s reputation for truthfulness. Because another witness did not put Z.M.'s character for truthfulness at issue, the evidence was not admissible under ER 608(b)(2).

details and her inconsistent retelling of the events. Also on cross-examination, Z.M. testified that Ives "push[ed]" Z.M. to disclose what Freeman did to her in 2018. Freeman also elicited testimony from Natasha that Z.M. never told her that Freeman entered her bedroom while she was sleeping and sexually assaulted her. Natasha also testified that she would have heard Freeman leave their shared room at night to enter Z.M.'s bedroom.[5]

For these reasons, the record shows that even without the excluded testimony, Freeman offered evidence supporting his theory that Z.M. lacked credibility and that her accusations against him were false. The trial court did not violate Freeman's constitutional right to present a defense.

2. Opinion Testimony

Freeman argues the State violated his right to a fair trial by eliciting improper opinions on his guilt from M.C. and Ives. The State contends the testimony did not amount to improper opinions and, even if it did, any error was harmless.[6] We agree that any error was harmless.

A witness may not provide an opinion, directly or by inference, on a defendant's guilt because doing so violates the defendant's constitutional right to a jury trial. *State v. Smiley*, 195 Wn. App. 185, 189, 379 P.3d 149 (2016). Specifically, it impedes the jury's ability to independently determine the facts. *State v. Fleeks*, 25 Wn. App. 2d 341, 368, 523 P.3d 220, *review denied*, 1 Wn.3d

---

[5] Further, on cross-examination, defense counsel elicited testimony from J.M. that he never woke up to find "Freeman in the bedroom" he shared with Z.M.

[6] The State also argues that Freeman waived these arguments by failing to object. We choose to exercise our discretion under RAP 2.5(a) and address the issues.

1014, 530 P.3d 185 (2023). Opinion testimony is improper when it comments on the witness' veracity or intent, tells the jury what decision to reach, or concludes a defendant is guilty. *Id.* at 369.

In determining whether statements are impermissible opinion testimony, we consider the type of witness, the specific nature of the testimony, the nature of the charges, the type of defense, and other evidence before the jury. *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007). And, absent evidence otherwise, we presume the jury follows the court's instructions. *Id.* A constitutional error is harmless and not grounds for reversal if the State shows beyond a reasonable doubt that the jury would have reached the same verdict without the error. *State v. Orn*, 197 Wn.2d 343, 359, 482 P.3d 913 (2021).

A. M.C.'s Testimony

Freeman argues M.C. improperly expressed her opinion about his guilt. Specifically, he challenges M.C.'s testimony about how she felt after Z.M. told her about Freeman squeezing her buttocks. M.C. testified, "I was worried for her and her safety and I was disgusted and appalled. And I was just really worried about her."

Even if M.C.'s testimony amounted to an improper opinion, any error was harmless. M.C. did not explicitly testify that Freeman was guilty, nor did she comment on Z.M.'s veracity. And just before M.C. testified about how Z.M.'s disclosure made her feel, the trial court instructed the jury that testimony from other witnesses about Z.M.'s disclosure "cannot be considered as evidence of

the truth of [Z.M.'s] claims." The court also instructed the jury at the end of trial, "You are the sole judges of the credibility of each witness."

We presume the jury followed the court's instructions. So, Freeman fails to show M.C.'s testimony violated his right to a fair trial.

B. Ives' Testimony

Freeman argues that Ives also rendered an improper opinion on his guilt. Specifically, he challenges Ives' testimony about whether she felt Z.M. would be safe when she went home to Natasha. Ives testified, in relevant part:

> Q.      Did you feel safe — did you feel [Z.M.] would be safe going home to mom?
> A.      It's not mom but just the environment, not safe, no.
>       THE COURT:    And this isn't admitted for the truth, ladies and gentlemen, but for this witness's point of view, if you follow me. Her feelings, not for the truth of her feelings.

Again, even if Ives' testimony could be characterized as a comment on Freeman's guilt, any error was harmless. Ives did not comment on Z.M.'s veracity, and she was not the first witness to testify about her concern for Z.M.'s safety at home. Z.M. testified she stayed at M.C.'s house the night of the June 2020 incident because M.C.'s family "felt I was unsafe" at her own house. And the next morning, Combs testified she wanted to be sure it was safe for Z.M. to return home, which is why she called CPS. Freeman did not object to either statement. Further, just after Ives' testimony, the court instructed the jury that Ives' statement was not admitted "for the truth of her feelings."

Again, we presume the jury followed the court's instructions, and Freeman fails to show Ives' testimony violated his right to a fair trial.

12

3. Cumulative Error

Freeman argues that cumulative error denied him a fair trial. We disagree.

The cumulative error doctrine applies when cumulative errors produce a fundamentally unfair trial. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Application of the doctrine "is limited to cases where there have been several trial errors." *State v. Azevedo*, 31 Wn. App. 2d 70, 85-86, 547 P.3d 287 (2024). And it does not apply where "the errors are few and have little or no effect on the trial's outcome." *State v. Venegas*, 155 Wn. App. 507, 520, 228 P.3d 813 (2010).

Freeman has not shown several trial errors, so he is not entitled to relief under the cumulative error doctrine.

4. LWOP Sentence under the POAA

Freeman next argues that the trial court erred by sentencing him to LWOP under the POAA because the POAA's "two-strikes" law is unconstitutional. The State contends we should reject Freeman's argument because it is "nearly identical" to that "rejected by Division Two of this Court" in *State v. Nelson*, 31 Wn. App. 2d 504, 550 P.3d 529, *review denied*, 3 Wn.3d 1030, 559 P.3d 496 (2024).[7] We agree with the State.

We review constitutional challenges de novo. *State v. Ross*, 28 Wn. App. 2d 644, 646, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026, 544 P.3d 30

---

[7] The State also argues that Freeman waived this argument by not challenging the POAA below. We choose to exercise our discretion under RAP 2.5(a) and address the issue.

(2024). We presume statutes are constitutional and place the burden on the challenger to show unconstitutionality. *Id.*

Under the POAA, a "persistent offender" is an offender convicted of two of the felony sex offenses listed in RCW 9.94A.030(37)(b), or three of the felonies considered a most serious offense listed in RCW 9.94A.030(37)(a). Sentencing courts consider each offense listed in RCW 9.94A.030(37)(a) and (b) as a "strike" offense. *See Nelson*, 31 Wn. App. 2d at 512. The trial court "shall" sentence a persistent offender to life in prison without the possibility of release. RCW 9.94A.570.

Relying on *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), Freeman asserts that courts administer the POAA's two-strikes law "in a racially disproportionate manner," violating the prohibition on cruel and unusual punishment. *See* WASH. CONST. art. I, § 14. In *Gregory*, our Supreme Court held that Washington courts imposed the death penalty in an arbitrary and racially biased manner, violating the state constitutional prohibition on cruel punishment. 192 Wn.2d at 35. As a result, the court converted all death sentences to life imprisonment. *Id.* at 36.

Freeman points out that like the death penalty, the POAA's two-strikes law has a "strikingly disproportionate impact on populations of color." But as Division Two explained in *Nelson*, "imposition of a[n] LWOP sentence under the POAA involves a different procedure than the imposition of the death penalty addressed

14

in *Gregory*."[8]  31 Wn. App. 2d at 515.  Unlike the death sentence at issue in

*Gregory*, sentencing courts do not administer the POAA on a case-by-case

basis.  *Id.* at 516.  Instead, courts administer the POAA "the same way no matter

who the defendant; *all* [persistent] offenders . . . will be sentenced to LWOP."  *Id.*

at 516-17.  As a result, Division Two declined to conclude that the POAA was

unconstitutional under *Gregory*'s framework.  *Id.* at 517.[9]

Because the POAA mandates the trial court to impose an LWOP sentence

for all persistent offenders, Freeman fails to show the act is unconstitutional.

5. VPA

Freeman argues we should remand for the trial court to strike the $500

VPA against him because he was indigent at the time of sentencing.  The State

does not object.

On July 1, 2023, four months after the trial court sentenced Freeman, the

legislature's amendment to RCW 7.68.035 took effect, providing that the court

"shall not impose the [VPA] under this section if the court finds that the

defendant, at the time of sentencing, is indigent as defined in RCW

10.01.160(3)."  LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4).  And our Supreme

Court has held that statutory amendments pertaining to costs imposed on

---

[8] We reached the same conclusion in several unpublished opinions and cite them here only for their persuasive value under GR 14.1(a).  *See, e.g., State v. Kennon*, No. 80813-3-I, slip op. at 23-28 (Wash. Ct. App. Aug. 16, 2021) (unpublished), https://www. courts.wa.gov/opinions/pdf/808133.pdf; *State v. Legrone*, No. 85116-1-I, slip op. at 11-14 (Wash. Ct. App. Sept. 23, 2024) (unpublished), https://www.courts.wa.gov/opinions/ pdf/851161.pdf.

[9] We recognize that *Nelson* addressed only the POAA's three-strikes law, but Freeman does not identify how the POAA's two-strikes law meaningfully differs for this analysis.

conviction apply prospectively to cases that are not yet final. *State v. Ramirez*, 191 Wn.2d 732, 749, 426 P.3d 714 (2018).

When the court sentenced Freeman in March 2023, it found him indigent. And his appeal was pending when the amendment took effect, so his case was not yet final. *Ramirez*, 191 Wn.2d at 749. We remand for the trial court to strike the VPA.

We affirm Freeman's convictions and sentence but remand for the trial court to strike the VPA from his judgment and sentence.

_____, ACJ

WE CONCUR:

_____          _____
Colburn, J.