IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40305-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| DOUGLAS GLENN CAMPBELL | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J.P.T.[†] — Douglas Campbell appeals, on pretrial discovery and evidentiary grounds, three convictions of first degree child molestation of a step-grandson. Campbell also appeals the trial court's denial of a Special Sex Offender Sentencing Alternative (SSOSA). We affirm Campbell's convictions and sentence.

FACTS

The prosecution of Douglas Campbell arises from his interaction with W.R.A., a step-grandson. W.R.A. accused Campbell of touching W.R.A.'s penis and having W.R.A. touch his penis. We take the facts from trial testimony.

Douglas Campbell is married to Cathy Campbell. Because Douglas and Catherine (Cathy) Campbell share the same surname, we refer to Cathy by her first name but refer to Douglas using his surname. Campbell's marriage to Cathy is his fourth marriage.

---

[†] George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

Campbell has two biological children from his first marriage, Jessica and Hollie Moreno, and two step-children from his second and third marriages, Mark Andrews and Shannon Stewart. Campbell's marriage to Cathy brought him two step-sons, Matthew and Michael Alverson. Matthew is married to Lindsey Alverson. Because Matthew, Michael, and Lindsey share the same surname, we refer to each of them by their first names.

In either late 2017 or early 2018, Cathy and Douglas Campbell moved to Spokane to be closer to Matthew Alverson and Matthew's two children, W.R.A. and E.A. W.R.A. was born on May 1, 2012, and E.A. was born in 2015. The Campbells frequently babysat W.R.A. and E.A., and these grandchildren occasionally stayed at their house for overnight visits.

On July 29, 2021, Camela Davies, Lindsey Alverson's mother and W.R.A.'s maternal grandmother, played with W.R.A. at Lindsey and Matthew's residence. W.R.A. was then nine years old. Davies had slept at the Alverson residence the previous night. W.R.A. asked Davies why she did not sleep in his bed. This conversation led to W.R.A. mentioning Douglas Campbell, his paternal step-grandfather. W.R.A. told Davies that he and Campbell slept naked when he spent the night at his grandparents' house, that Campbell taught him how to play with his penis, and that Campbell taught him how to

2

play with Campbell's penis. W.R.A. told Davies that "playing with his penis felt good." Clerk's Papers (CP) at 5. When Davies told W.R.A. that Campbell should not be doing that, W.R.A's face turned red, and he told her Campbell said not to tell anyone.

Camela Davies immediately relayed W.R.A.'s disclosure to W.R.A.'s mother, Lindsey Alverson. Lindsey then spoke with W.R.A. W.R.A. told her that Douglas Campbell had touched his privates and told him to keep it a secret. The mother did not ask W.R.A. about any details of the touching.

On August 1, 2021, Spokane County Deputy Sheriff David Bratton visited Lindsey and Matthew Alverson's residence in response to a report of child molestation. After interviewing both Matthew and Lindsey, Sheriff Deputy Bratton forwarded his case report to Spokane County Sheriff's Department Detective Michael Wall, who assumed supervision of the investigation. Detective Wall scheduled a forensic interview, for W.R.A., with Meghan Davidson at Partners with Families and Children. Davidson interviewed W.R.A. and his sister, E.A., on August 24, 2021.

PROCEDURE

On December 15, 2021, the state of Washington charged Douglas Campbell with three counts of first degree child molestation. The charging information alleged Campbell committed these crimes against W.R.A. sometime between January 1, 2020,

and March 31, 2021. W.R.A. turned 8-years-old on May 1, 2020, and 9 years old on May 1, 2021.

On January 11, 2022, the State filed notice to present child hearsay testimony at trial. The notice declared the State's intent to admit statements W.R.A. made to Camela Davies, Lindsey Alverson, Matthew Alverson, and Meghan Davidson.

On December 21, 2022, Douglas Campbell filed a motion and memorandum to admit reputation and good conduct evidence under ER 404(a)(1) and 405(a), (b) from Mark Andrews, Jacob Andrews, Shannon Stuart, Wyatt Shaw, Dakoda Gonzalezz, Matthew Alverson, Michael Alverson, Deborah Allen, Victoria Fischer, Pamela Lux-Archer, Sophia Lux-Archer, and Devon Lux-Archer. All of these individuals are family members of Campbell, except for the Lux-Archers. The Lux-Archers were neighbors of the Campbells. Campbell argued that, because of the difficulty of defending W.R.A.'s vague accusations, the trial court should permit testimony from individuals who, for years, had uniquely observed his propensity or lack thereof to have sexual contact with a child. Campbell wrote that his proposed witnesses belonged to a family community that interacted with him for many years. Campbell declared that these individuals would have testified that he lacked any propensity to touch a child for his sexual gratification and that he had a reputation within the community for good sexual morality. Nevertheless, when

4

outlining the expected testimony of each witness, the outline mentioned only the witnesses' contact with Campbell and their observations of his interactions with children. The outlines did not specify that any witness knew of a reputation of Campbell for good sexual morality, how the witness knew of that reputation, and the community in which the reputation arose.

The State opposed Douglas Campbell's motion to introduce evidence of good reputation and conduct for two reasons. First, all proffered witnesses lacked neutrality because of being family members or close friends. Second, no party may introduce evidence of prior acts merely to demonstrate a person's character or propensity for engaging in charged conduct when character is not an element of the criminal charge.

On February 17, 2023, the trial court conducted a hearing on Douglas Campbell's motion to admit reputation and good conduct evidence. During the hearing, Campbell talked about wishing to introduce reputation evidence, but Campbell never identified any witness who would testify to a community in which Campbell held a reputation.

After hearing testimony, the trial court denied Douglas Campbell's motion for introduction of evidence. The court entered findings of fact and conclusions of law, which read in part:

II. Findings of Fact

A.  Evidence Rule 404(a)(1)—Reputation Evidence

1. Defendant proffered a list of approximately a dozen proposed witnesses to testify about the sexual morality of Defendant.
. . . .
3. These witnesses, with the exception of Pamela, Sophia, and Devon Lux-Archer, are related to Defendant by blood or marriage and constitutes [sic] a large and extended family.
4. This group cannot form a neutral and general community based on the inherent nature of family relationship.
5. The Lux-Archers were once neighbors of Defendant and the three proposed witnesses all lived within one household.
6. Neighbors, such as the Lux-Archers, could potentially comprise a more general community based on the nature of the relationship, but there is not a proper foundation at this time due to the limited group that has been proffered.
7. Other communities who could potentially form a neutral and general community would include, but not be limited to, a business community, neighborhood community, and a school community.

B.  Evidence Rule 405—Specific Instances of Conduct

1. Defendant summarizes potential testimony of specific instances of conduct to include the following:
a. A camping trip with proposed witness Mark Andrews and Defendant where nothing sexual happened; and
b. An overnight off-road adventure with proposed witness Wyatt Shaw here nothing sexual happened; and
c. A time when Defendant would not get out of bed naked specifically so that W.R.A. would not see him naked through proposed witness Matt Alverson.

III. Conclusions of Law

A. Evidence Rule 404(1)(a)—Reputation Evidence

1. *State v. Cox*, 17 Wash. App. 2d 178 (2021) found that reputation for good sexual morality is relevant so long as the proper foundation can be laid.

2. The facts in *Cox* are relevant. Defendant proffered four coworkers as well as friends to testify about his reputation within that community and the anticipated testimony would be that they had never heard anything negative about Defendant's sexual morality. Id.

3. *Cox* found that, subject to the proper foundation, Defendant can introduce reputation evidence of good sexual morality. Id.

4. In order to establish the proper foundation, the moving party must show that the community is both neutral and general.

5. It is important for the Court to consider the types of people and the number of people purported to constitute the community.

6. Based on *State v. Gregory*, 158 Wn.2d 759, 147 P.2d [P.3d] 1201 (2006), a community must comprise of more than two people.

7. Based on case law, family cannot comprise a neutral and general community based on the inherent nature of the familial relationships.

[B.] Evidence Rule 405—Specific Instances of Conduct

1. Based on *State v. Lorenz*, 152 Wn.2d 22, 93 P.3d 133 (2004), sexual gratification is not an essential element of Child Molestation because it does not appear in the Child Molestation statute, but is in the definitions section.

2. Sexual gratification is not an essential element of Child Molestation and specific instances of conduct cannot be offered under ER 405.

CP at 55-57.

On May 11, 2023, Douglas Campbell filed a second motion and memorandum to

admit evidence under ER 404(a)(1).  In the motion, Campbell wrote that the trial court

had previously ruled that his family did not form a credible community and thence denied

his request for testimony from family members about his reputation for good sexual

morality.  Campbell insisted, however, that the trial court had earlier concluded that

neighbors or other communities could comprise a more neutral and general community

with the proper foundation.  Therefore, the court should grant his second motion to admit

evidence concerning his reputation for good moral sexuality from a group of neighbors

and from a group of Ford Bronco enthusiasts.  The State did not object to the introduction

of reputation evidence from the neighbor group or the Ford Bronco group if Campbell

limited the testimony.  The trial court granted the motion, subject to limitations.

W.R.A.'s mother disclosed to Cathy Campbell that W.R.A. suffered significant

bullying at school.  As a result, Douglas Campbell subpoenaed W.R.A.'s school records.

Our clerk's papers do not include the subpoena.

The State filed a motion to quash the subpoena issued by Douglas Campbell for

W.R.A.'s school records.  The State argued in its motion to quash that Campbell neither

offered any information relating to the purpose of the subpoena nor identified the

relevance of the records to his defense.

The superior court entertained oral argument in support of approving and in

support of quashing the subpoena. The court asked Douglas Campbell's counsel about

the connection between the school records and the defense of Campbell. Counsel

contended that W.R.A. suffered bullying at school. The trial court also asked about the

relationship between school bullying and possible false accusations of sexual

molestation:

> THE COURT: Couple of questions for you, because I'm trying to understand the nexus here. I understand you have an expert, and I think you've told me that the expert—part of what you anticipate your expert testifying to is why children may make a late disclosure. Is that correct; did I understand that correctly?
>
> MR. PARTOVI [defense counsel]: I mean, I certainly think that's within the scope of it. But I wouldn't limit it to late disclosure.
>
> THE COURT: No, no, but that's why—I'm trying to understand why bullying at school has anything to do with an alleged molestation at home.
>
> MR. PARTOVI: We don't know what the scope of the bullying is. We know it's taking place. What if somebody is squeezing his penis and he doesn't want to talk about to the kids at school because he's scared of them, so he's blaming his father and his step-grandfather, two that he knows are on his side and won't bully him? I don't know. I'm saying we've got him alleging multiple men are squeezing his penis and he's getting bulled at school.
>
> THE COURT: But I'm not seeing the nexus, though, between the bullying at school and an allegation of molestation. I'm just not seeing how the two are linked.
>
> MR. PARTOVI: Of course not.
>
> THE COURT: So make the link for me.
>
> MR. PARTOVI: You haven't seen the records, how could you possibly make the link?
>
> THE COURT: But I need you to make the link how they are relevant.

9

MR. PARTOVI: I haven't seen the records either. I know he's being bullied, I think it's legitimate to investigate the scope of the bullying. Let's say, for example, that we look at it and he's getting bullied because he told some teacher that these kids squeezed his penis and therefore they're giving him a hard time, how dare you accuse us of that, and mom sees it and she doesn't know the details and so she's sad. Right?

Then if we read that, if we know those details about the bullying, then, boom, huge nexus. Let's say we look at the records and the bullying is because he wore pink shoes and the boys don't think he should wear pink shoes and they're calling him names and they're pushing him around. Now there's no nexus. You know, I mean, the nexus is he's getting bullied at school and that's a significant factor. I mean, in any place where there's not an oppressive system trying to send my client to prison, in any other world in this society bullying is a significant problem in the school. But because we're so intent on filling the God damn prisons with people that didn't do anything wrong, now it's show me the nexus to the record you haven't seen.

I can't give you that. I can give you multiple witnesses that say this kid is getting bullied at school. All I want to do is know what that means. It's beyond a reasonable request. There is a specific nexus. We know he's getting bullied at school, I want to see what that means.

2 Report of Proceedings (2 RP) at 58-60.

The trial court granted the motion to quash the subpoena for school records. The order quoted language contained in the initial subpoena, which sought:

Copies of and all records, educational and behavioral, included by not limited to attendance records, demographics forms, grades, student contact information records, account notes and/or letters, emails, other forms of communication related to changes in contact information, related to: W.R.A. DOB 05/12/2012 for the duration of his education with your school district.

CP at 107. The court's order explained that Campbell failed to establish relevance.

10

On November 6, 2023, the trial court conducted a child hearsay hearing. W.R.A., Lindsey Alverson, Matthew Alverson, Camela Davies, and Meghan Davidson testified at the hearing. The Alversons testified to the truthfulness of their son, W.R.A. All witnesses testified to statements uttered by W.R.A. to them about sexual contact between W.R.A. and Douglas Campbell. Campbell's defense counsel did not oppose admission at trial of the hearsay evidence. Counsel mentioned near the close of the hearing that some of the hearsay testimony would benefit Campbell because of its inconsistency with other statements of W.R.A. The superior court granted the State's motion to admit the child hearsay statements.

Trial on Douglas Campbell's child molestation charges began the following day, November 7, 2023. Individuals testifying at trial included Camela Davies, W.R.A, Lindsey Alverson, Matthew Alverson, Deputy Sheriff David Bratton, Sergeant Michael Wall, Meghan Davidson, and Cathy Campbell. Douglas Campbell testified in his defense. The State played, for the jury, the videos of W.R.A.'s and E.A.'s forensic interviews with Davidson. During trial, the defense attacked the thoroughness of law enforcement's investigation, the lack of corroboration of W.R.A.'s allegations, and the unreasonableness and inconsistency of W.R.A.'s various statements.

Ted Pulver, a private investigator and polygrapher, testified on behalf of Douglas

11

Campbell. Pulver worked on sex offender management boards and considered himself successful in catching sex offenders. Pulver testified he believed investigations should begin with a hypothesis, which an investigator should seek to disprove. If the hypothesis cannot be disproved, that hypothesis most likely occurred. Engaging in a scientific type investigation forced an investigator to review the entire situation with an open mind.

During trial, Ted Pulver averred that many sex offenders have common attributes. Thus, the investigator should scrutinize the background, history, and personal relationships of a suspect. In his investigations, Pulver also investigated whether others influenced information presented by the accuser about sexual molestation. This task included probing the potential suggestibility of the purported victim.

Douglas Campbell also called to testify Brent DeuPree, a private investigator and former law enforcement sex offense investigator. DeuPree reviewed the evidence against Campbell, including the forensic interviews. He perused background reports on Campbell. He conducted social media searches, google searches, and open-source searches on Campbell. He separately interviewed Campbell and his wife. DeuPree pursued other potential victims of Campbell. He interviewed the State's witnesses. After viewing E.A.'s interview in which she talked about Grandpa "Al" or "Owl," DeuPree performed a background check on Kenneth Alverson (Grandpa Al), but could not

interview him because of his death.  Interviews of defense witnesses included questioning

about uncomfortable subjects.  Some of these witnesses had spent time with Campbell

when they were children.  DeuPree toured the Campbell home.

Brent DeuPree learned at Douglas Campbell's initial interview that W.R.A. had

grabbed Campbell's hand and placed it on W.R.A.'s crotch, that W.R.A. and E.A. uttered

off handed comments while at the Campbells' home, and that W.R.A. alleged to Cathy

that his father disciplined him by squeezing his penis.  When DeuPree interviewed

Matthew Alverson, W.R.A.'s father, Alverson did not immediately deny the allegation

about punishment, but eventually did so.   DeuPree testified about W.R.A.'s desire to

"catch people naked."  This desire loomed important in the investigation.  1 RP at 1137.

Brent DeuPree investigated the background of Douglas Campbell by interviewing

26 people who knew Campbell, including step-children.  No one corroborated that

Campbell sexually molested a child.  Even Campbell's former wife made no such

allegation.

Dr. Jason Dickinson, a psychology professor, specializes in eyewitness memory,

child eyewitness testimony, and forensic interviewing.  He testified for Douglas

Campbell that, in cases when a child delays disclosure, a forensic interview may be

affected by memory decay.  A child's memory may be contaminated or subject to post-

event suggestibility. Emotions may shape memory and W.R.A.'s concern about facing discipline could influence his memory. Suggestibility, resulting from exposure to sexual content or conversations between adults or peers, can occur before a child undergoes a forensic interview. Concerned, well-meaning parents may question a child in a potentially suggestive way.

Dr. Jason Dickinson conducted research into suggestibility. In a study of 300 children, one third of the children made unintentional false reports attributed to a false memory about touching suggested by the researchers but not experienced by the child. According to Dickinson, child witness' memories tend to be less accurate than adult memories, and children have a propensity for false recognition. Children tend to answer "yes" to a question even if they do not know the answer. 1 RP at 1236.

Dr. Jason Dickinson opined that the "gold standard" demanded an interview of the child within 24 hours of disclosure. Meghan Davidson interviewed W.R.A. 27 days after disclosure, a length of time Dickinson described as "unusual." 1 RP at 1244. Dickinson reviewed W.R.A.'s forensic interview by Davidson. Dickinson highlighted examples of potential miscommunication between W.R.A. and the interviewer, including questions the interviewer asked that might have "overlayed" her "subjective understanding" of the alleged event to the conversation. 1 RP at 1240. Dickinson opined Davidson may not

14

have adequately explored alternative explanations for W.R.A.'s allegation.

During trial testimony, Jason Dickinson opined W.R.A. might have interpreted grandmother Camela Davies' comment that Douglas Campbell should not have touched him as an admonishment to W.R.A., potentially impacting his memory and later forensic interview. Similarly, Lindsey Alverson's emotional response to W.R.A.'s allegations could have affected his interview responses.

During closing argument, Douglas Campbell's counsel commented about W.R.A.'s comments during his forensic interview regarding the alleged touching by Campbell: "In the forensic interview that I imagine you will watch again, [W.R.A.] doesn't say it was three times. He says it was two or three times." 1 RP at 1360.

The jury began deliberating on November 15, 2023. The next day, on November 16 at 10:15 a.m., during deliberations, the jury submitted the following question to the trial court: "Can we watch [W.R.A.]'s & [E.A.]'s interviews?" CP at 328. The trial court granted the request. The record does not indicate whether the trial court discussed the question with counsel before answering the jury and under what circumstances the jury viewed the interviews. During trial, Douglas Campbell never objected to the trial court allowing the jury to view the recordings.

On November 16, the jury found Douglas Campbell guilty of all three charges of

first degree child molestation.

On January 5, 2024, defense counsel filed a motion for furlough requesting that Douglas Campbell's sentencing be continued to allow him to obtain a special sex offender sentencing alternative (SSOSA) evaluation. The State agreed to a continuance of sentencing and an evaluation.

Priscilla Hannon, certified sex offender treatment provider and licensed mental health counselor, conducted an examination of Douglas Campbell to determine whether Campbell was amenable to treatment and to assess his relative risk to the community. The psychosexual evaluation conducted by Hannon scored Campbell in the low risk category for being charged or convicted of another sex offense. Hannon found Campbell an appropriate candidate for a SSOSA and amenable to treatment, despite his denial of the offense. A Department of Corrections pre-sentence investigation report recommended rejection of a SSOSA because of Campbell's denial of guilt.

At sentencing, the trial court indicated that it had reviewed Priscilla Hannon's report. The court proceeded to outline the statutory factors required in determining whether to grant or deny a SSOSA. The court acknowledged that W.R.A. and his family did not support a SSOSA. The court expressed concern that the SSOSA was too lenient. The court addressed the risk Campbell would present to the community, to W.R.A., or to

16

persons of similar age.  The court further expressed a belief that Campbell would abide

by the restrictions of the SSOSA, if ordered.

During the sentencing hearing, the sentencing court emphasized amenability as

important.  The court mentioned that Priscilla Hannon's report helped it understand that

an individual who denies the underlying offense can still be subject to and amenable to

treatment.  The court noted that Douglas Campbell was low on Hannon's scale for

reoffending.  Still, the court denied Campbell' request for a SSOSA because the sentence

would be too lenient, W.R.A. disfavored a SSOSA, a SSOSA would not benefit

Campbell or the community, Campbell did not believe he suffered from a sexual

dysfunction, and Campbell denied any inappropriate conduct.  The court explained:

> [U]ltimately the Court has to make the determination regardless of
> the generalized belief that an individual who does not accept responsibility
> or acknowledge the issue can perhaps benefit from treatment.
> When the Court applies its own analysis here and then considers the
> factors to amenability, the Court is looking at the background, history,
> social economic circumstances, psychological condition, and that both he
> and the community benefit from a community-based treatment under the
> SSOSA.
> I think based on the concerns the Court has with the abuse of trust
> issue undercutting the factor as identified in terms of whether this would be
> too lenient, the Court believes that disfavors granting of it.  This Court
> weighs the victim's position and heavily weighs it pursuant to the statutory
> requirements that disfavors this option for resolution.  And the Court cannot
> find and be comfortable that given all the information provided here that
> treatment is in the best interest of both Mr. Campbell and the community.

And I will make it clear for the record the Court's concern is that the background, history, social and economic circumstances as identified in the report of Ms. Hannon do not demonstrate that Mr. Campbell believes he has an issue. I do accept and I listened very carefully in his—Mr. Campbell did say it's all because of me, and that was a good statement to indicate in his recitation. But in terms of acknowledging that he has an issue with something that requires the treatment for a sex offense when he denies that this even occurred or that he has that issue, and I'm not as concerned under the subsection the six part two, the two Subsection 26 [sic] parts analyzation for the acceptance of responsibility.

I am concerned with his amenability based on denial that he has this issue, denial that this occurred. And I appreciate that he accepts the jury's verdict as indicated in both the briefing and his statements. The Court believes that that given that background, history, the social circumstances the Court has identified in terms of his family support network, that I don't believe the—and I don't find that he and the community benefit from a community-based treatment when the underlying issue is denied.

. . . .

But when I look at this specific case under those factors, Mr. Campbell still denies that this occurred and that he has this issue. And that from this Court's perspective and analyzing all the information does not make this an appropriate resolution for both he and the community and the benefit standpoint. Also highlighting the concern about whether this would be too lenient based on the abuse of trust issue and the wishes of the victim, which is in opposition to this, which the Court has to greatly weigh. So considering all the statutory and other factors, the Court is going to not grant the request for the SSOSA alternative. And I believe that is appropriate based on the facts specific to this case and the law as the Court is required to apply it.

2 RP at 120-25.

18

LAW AND ANALYSIS

On appeal, Douglas Campbell complains that the State and the trial court

prevented him from defending himself by presenting evidence of his spotless character

around children while the State unfairly bolstered the credibility of his accuser, W.R.A.

Therefore, Campbell assigns error to the trial court's exclusion of testimony from family

members and neighbors of his reputation for sexual morality with children, the State's

introduction of child hearsay testimony, the court's quashing of a subpoena for school

records, and the jury viewing an interview of W.R.A. in the jury room. He also protests

that his trial counsel did little to prevent these injustices. Thus, Campbell also seeks

reversal of his convictions because of ineffective assistance of counsel. Finally,

Campbell asks that we direct the superior court to sentence him to a SSOSA alternative.

We reject all assignments of error.

*Reputation for Sexual Morality with Children*

Douglas Campbell argues that the trial court erred when excluding testimony from

witnesses vital to his defense based solely on their status as family members or

neighbors. When forwarding this argument, Campbell relies both on evidentiary rules

and the constitutional right to present a defense.

The State of Washington faults Douglas Campbell's offer of proof for reputation

19

evidence as insufficient. The State further argues that Campbell failed to adequately brief

his constitutional right and any violation of that right does not qualify as manifest.

Finally, the State contends that, even if the court erred in excluding the reputation

evidence, any error was harmless.

*Evidentiary Error*

We begin by addressing whether the trial court's exclusion of the evidence

amounted to evidentiary error. Later we address whether Douglas Campbell adequately

argued in his opening brief the contention that the trial court's exclusion of the evidence

rose to constitutional error.

This court reviews a trial court's interpretation of an evidentiary rule de novo.

*State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). If the trial court correctly

interpreted the rule, we review the court's decision to admit or exclude evidence for an

abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17 (2003); *State v. Land*, 121

Wn.2d 494, 500, 851 P.2d 678 (1993); *State v. Callahan*, 87 Wn. App. 925, 934, 943

P.2d 676 (1997). A trial court abuses its discretion when it acts in a manner manifestly

unreasonable or based on untenable grounds or reasons. *State v. Land*, 121 Wn.2d 494,

500 (1993).

Douglas Campbell relies on ER 404 and 405, which allow a criminal defendant to

introduce evidence of a relevant trait or character. ER 404 reads, in relevant part:

> (a) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
> (1) Character of Accused. Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same.

ER 404(a)(1) (emphasis omitted) (boldface omitted). ER 405(a) provides that,

> [i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(Boldface omitted) (alteration added). Although ER 404(a)(1) reads that proof "may" be introduced by testimony of reputation, the rule demands that the accused introduce evidence of a germane character trait only by reputation testimony.

A witness offering reputation testimony must lay a foundation establishing that the subject's reputation lies on perceptions in the community. ER 608(a). Personal opinion does not suffice. *State v. Callahan*, 87 Wn. App. 925, 935 (1997). In addition, the party seeking to admit reputation evidence must demonstrate that the community is *both neutral and general* in order to establish the community as valid. *State v. Land*, 121 Wn.2d 494, 500 (1993). Factors trial courts consider in determining the validity of the proposed community include (1) the frequency of contact between members of the community, (2) the amount of time a person is known in the community, (3) the role a

person plays in the community, and (4) the number of people in the community. *State v. Land*, 121 Wn.2d 494, 500 (1993).

The parties argue over whether family members and neighbors consist of a community sufficient to present reputation evidence. We need not answer this question, although case law probably answers that question in the negative. *State v. Lord*, 117 Wn.2d, 829, 874, 822 P.2d 177 (1991); *State v. Gregory*, 158 Wn.2d 759, 805, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R., Jr.*, 181 Wn.2d 757, 336 P.3d 1134 (2014). We agree with the State's observation that Douglas Campbell has not identified any proposed family or neighbor witness who would testify to a reputation of Campbell in a defined community.

Douglas Campbell failed to lay the proper foundation to enable his family members and three neighbors to testify about his reputation for good sexual morality. His motion to introduce evidence listed witnesses, but specified no witness who knew of any reputation of Campbell in an identifiable community. His appeal brief also fails to mention any witness with knowledge of a reputation or how the witness gained such knowledge.

### *Constitutional Error*

The State contends that Douglas Campbell, in his opening brief, insufficiently

argued that the trial court's exclusion of reputation evidence amounted to constitutional error. We agree.

This court may decline to review issues not raised before the trial court. RAP 2.5(a); *State v. O'Hara*, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009). The section of Douglas Campbell's opening brief dedicated to arguing the trial court erred in excluding the reputation evidence regarding his good sexual morality lacked any constitutional argument. Campbell argued in his reply brief that the trial court's ruling amounted to constitutional error and cites to legal authority to support his position. An appellate court will not consider a constitutional argument raised for first time in a party's appellate reply brief. *Oostra v. Holstine*, 86 Wn. App. 536, 543, 937 P.2d 195 (1997).

In addition, Douglas Campbell did not contend before the trial court that exclusion of the reputation evidence violated his constitutional right to present a defense. Therefore, he would need to show manifest constitutional error before we reviewed the assigned error on appeal. RAP 2.5(a). Campbell does not claim manifest constitutional error.

*School Records*

Douglas Campbell next argues the trial court abused its discretion by requiring direct proof of a relationship between W.R.A.'s bullying at school and W.R.A.'s

allegations of sexual abuse in order to merit a subpoena of school records. According to

Campbell, the court did not properly balance Campbell's right to investigate and present

a defense against W.R.A.'s privacy interests in his own school records. Also, Campbell

argues that school records hold no discovery privilege. In addition to disagreeing on the

merits of Campbell's assignment of error, the State argues that Campbell shows no

prejudice by the denial of the subpoena.

CrR 4.7(e) applies when a defendant requests disclosure beyond the requirements

on the prosecutor to disclose under CrR 4.7(a), (c), or (d). *State v. Blackwell*, 120 Wn.2d

822, 828, 845 P.2d 1017 (1993); *State v. Putman*, 21 Wn. App. 2d 36, 50, 504 P.3d 868

(2022). CrR 4.7(e) reads, in relevant part:

> Upon a showing of materiality to the preparation of the defense, and
> if the request is reasonable, the court in its discretion may require
> disclosure to the defendant of the relevant material and information not
> covered by sections (a), (c) and (d).

CrR 4.7(e)(1). Under the rule, a discovery request must satisfy two elements: (1) the

information sought must be material, and (2) the discovery request must be reasonable.

*State v. Norby*, 122 Wn.2d 258, 266, 858 P.2d 210 (1993). Upon the satisfaction of both

of these elements, the trial court possesses discretion to condition or deny the disclosure

request if a substantial risk of harm or unnecessary annoyance to any person outweighs

the disclosure's usefulness. *State v. Norby*, 122 Wn.2d 258, 266 (1993); CrR 4.7(e)(2).

The mere *possibility* that an item of undisclosed evidence *might* help the defense or *might* affect the outcome of the trial does not establish materiality in the constitutional sense. *In re personal restraint of Lui*, 188 Wn.2d 525, 566, 397 P.3d 90 (2017). A defendant who wishes to conduct additional discovery must advance some factual predicate which makes it reasonably likely the requested file will bear information material to his or her defense. *State v. Blackwell*, 120 Wn.2d 822, 830 (1993). A bare assertion that a document might bear such fruit is insufficient. *State v. Blackwell*, 120 Wn.2d 822, 830 (1993).

A related rule, CrR 4.8(b)(4), provides:

> On timely motion, the court may quash or modify a subpoena for production if it (A) fails to allow reasonable time for compliance; (B) requires disclosure of privileged or other protected matter and no exception or waiver applies; (C) is unreasonable, oppressive, or unduly burdensome; or (D) exceeds the scope of discovery otherwise permitted under the criminal rules.

During oral argument before the superior court, Douglas Campbell's counsel conceded that the defense did not know that any school records would bolster Campbell's defense. Counsel astutely argued that Campbell could not begin to determine if the records contained any pertinent information until he reviewed them. Counsel also could not promise the court that, assuming the records mentioned bullying, the nature of the bullying bore relevance to false allegations of sexual abuse. Thus, the trial court did not

abuse its discretion when quashing the subpoena. Campbell could not show the information sought was material. Campbell's subpoena mirrored a fishing expedition and thus did not constitute a reasonable request.

On appeal, Douglas Campbell emphasizes three foreign decisions. In *People v. Bachofer*, 192 P.3d 454 (Colo. 2008), the reviewing court ruled that the trial court properly quashed a subpoena after an in camera review prompted by the accused's claim that school records might impeach the credibility of a child witness. In *Zaal v. State*, 602 A.2d 1247 (Md. 1992), the court ruled that the defendant, accused of molesting his granddaughter, was entitled to review of school records when the records could show a pattern of acting out to get attention, or of lying, and would be relevant to effectively cross-examine concerning motivation, bias, and veracity. In *State v. Van Dyke*, 825 A.2d 1163 (N.J. 2003), the appellate court reversed the trial court's refusal to conduct in camera review of a juvenile victim's school records in sexual assault prosecution. The records raised serious questions concerning the credibility of the victim's mother, who testified that, prior to the alleged offense, her child was pleasant and helpful, while records described the victim as an angry young boy who engaged in misbehavior toward adults. Contrary to the cited decisions, Campbell showed no connection between W.R.A. being a victim of bullying and W.R.A.'s lack of credibility.

*Child Hearsay*

Douglas Campbell argues that, although the trial court properly conducted the mandatory *Ryan* hearing before trial, the court abused its discretion by admitting statements that did not qualify for admission under the child hearsay statute, RCW 9A.44.120. He insists that Matthew and Lindsey Alverson, W.R.A.'s parents, testified only to what Camela Davies told them, not to any statement uttered directly by their son to them. He also advocates for the unfairness of the State being able to repetitively describe W.R.A.'s allegations through the testimony of numerous people. The State responds, in part, that Campbell did not preserve the error at trial and inadequately briefed the assignment of error on appeal.

This court reviews a trial court's admission of child hearsay statements under RCW 9A.44.120 for an abuse of discretion. *State v. Swan*, 114 Wn.2d 613, 665, 790 P.2d 610 (1990). A trial court abuses its discretion when it acts in a manifestly unreasonable manner, on untenable grounds, or for untenable reasons. *State v. Land*, 121 Wn.2d 494, 500 (1993).

RCW 9A.44.120(1) declares, in relevant part:

> (1) A statement not otherwise admissible by statute or court rule, is admissible in evidence in . . . criminal proceedings . . . in the courts of the state of Washington if:
> (a)(i) It is made by a child when under the age of ten describing any

act of sexual contact performed with or on the child by another, describing any attempted act of sexual contact with or on the child by another, or describing any act of physical abuse of the child by another that results in substantial bodily harm as defined by RCW 9A.04.110.

. . . .

(b) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability.

RCW 9A.44.120(1)(a)(i), (b). The law labels the hearing mentioned in subsection (b) as a *Ryan* hearing. *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984). At such a hearing, trial courts must consider the following factors to determine the reliability of the hearsay statements (1) any motive of the child to lie, (2) the general character of the child, (3) the number of persons hearing the child's statement, (4) the spontaneity or lack of spontaneity of the child's statement, (5) the timing of the child's statement, (6) the relationship between the child and the witness, (7) whether the statement contains an express assertion about a past fact, (8) the ability of cross-examination to show the child's lack of knowledge, (9) the possibility of the child's recollection being faulty, and (10) the circumstances surrounding the statement demonstrate that the child did not misrepresent defendant's conduct. *State v. Ryan*, 103 Wn.2d 165, 175-76 (1984).

We note that both Matthew and Lindsey Alverson testified that each respectively

28

asked W.R.A. if he told grandma Camela Davies the truth. Nevertheless, W.R.A., in addition to answering "yes," directly told his mother that Douglas Campbell touched his privates.

Douglas Campbell acknowledges that his trial counsel did not object to any inadmissible child hearsay. He suggests he can challenge the ruling anyway because the trial court must enter findings of fact before admitting the child hearsay. We know of no rule that waives the requirement of an objection to evidence when the trial court must later issue findings of fact. Such a rule would allow a challenge to the admissibility of evidence for the first time on appeal in all bench trials.

This court does not consider issues raised for the first time on appeal unless they constitute manifest error affecting a constitutional right. RAP 2.5(a); *State v. O'Hara*, 167 Wn.2d 91, 97-98 (2009). Douglas Campbell does not assert manifest constitutional error.

*Allowing Jury Viewing of Recording*

Douglas Campbell argues the trial court abused its discretion when, during jury deliberations, it provided the jury with the videos of W.R.A.'s and E.A.'s forensic interviews. Campbell contends the court did not meaningfully analyze whether the interviews bore directly on the charges or whether they were unduly prejudicial. The

court, according to Campbell, also failed to control playback of the footage to prevent the jury from overanalyzing the evidence.

The State asks that we decline to review this assignment of error because Douglas Campbell did not object to the viewing of the forensic interview during jury deliberations. To the contrary, during closing argument, trial defense counsel suggested that the jury review some of the video to recall comments uttered by W.R.A. We grant the State's request. This court may decline to review issues not raised before the trial court. RAP 2.5(a); *State v. O'Hara*, 167 Wn.2d 91, 97-98 (2009).

### Assistance of Counsel

Douglas Campbell argues trial counsel provided ineffective legal assistance. In so arguing, Campbell notes impediments the accused faces when charged with a sex crime against a child. The trial pits the word of the child against the word of the adult defendant. The jury holds pity for the child. The child hearsay statute allows the prosecution to repeatedly introduce the same statements of the child. The accused may be an upstanding citizen with a spotless life story but the jury may never hear of the defendant's background or the prosecution effectively downplays the untarnished record. With these hindrances to success in mind, we have reviewed the entire trial transcript and clerk's papers and conclude defense counsel performed admirably when cross-examining

W.R.A. and other State witnesses, submitting testimony from Douglas Campbell and his witnesses, hiring specialists and presenting opinion testimony of experts on children's memories and forensic interviews, and summarizing the case in the light favorable to Campbell.

Still, Douglas Campbell attributes seven deficiencies to his trial counsel. First, his counsel conceded the credibility of W.R.A. Second, counsel failed to object to inadmissible child hearsay. Third, defense counsel presented inconsistent, contradictory, and illogical defense theories. Fourth, trial counsel presented evidence inconsistent to his concession of W.R.A.'s credibility when introducing evidence of other incidents showing W.R.A. lacked boundaries and credibility in relation to those events. Fifth, counsel ineffectively presented a strategy of competing investigations. Sixth, defense counsel failed to challenge the State's motion in limine prohibiting evidence on an alternate suspect. Seventh, defense counsel was generally unprepared, unfamiliar with the trial process, and made repeated evidentiary errors. Campbell argues he was prejudiced by defense counsel's deficient performance, given the seriousness of these errors, when considered individually or cumulatively.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel. *State*

*v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017); U.S. CONST. amend. VI; CONST. art. I, § 22.  To demonstrate ineffective assistance of counsel, a defendant must make two showings, (1) defense counsel's representation was deficient, *i.e.*, the performance fell below an objective standard of reasonableness based on consideration of all the circumstances, and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.  *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).  Because the defendant must satisfy both prongs, a failure to show either prong ends the inquiry.  *State v. Classen*, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Courts in the Evergreen State apply a strong presumption of the reasonableness of counsel's representation.  *State v. Estes*, 188 Wn.2d 450, 458 (2017).  Trial strategy and tactics cannot form the basis of a finding of deficient performance.  *State v. Crow*, 8 Wn. App. 2d 480, 508, 438 P.3d 541 (2019).  Therefore, a defendant asserting ineffective assistance of counsel has the burden of establishing the absence of a legitimate strategic or tactical reason supporting the challenged conduct or omission by counsel.  *State v. Crow*, 8 Wn. App. 2d 480, 508 (2019).

*Credibility of W.R.A.*

Douglas Campbell argues that defense counsel provided ineffective assistance of counsel by repeatedly conceding the credibility of W.R.A. Counsel commented on the credibility during the child hearsay hearing. Counsel also commented on credibility during voir dire, opening, and closing.

In arguing ineffective assistance of counsel, Douglas Campbell stretches the extent to which his trial counsel conceded W.R.A.'s credibility. Counsel only occasionally mentioned that W.R.A. appeared credible, but counsel never expressly stated that W.R.A. told the truth when he accused Campbell of a crime.

Trial counsel observed W.R.A. testify both during the child hearsay hearing and at trial and could determine better than us how W.R.A. appeared to the jury. Oftentimes, conceding the credibility of a witness, while finding other ways to attack the witness' story, serves the client's best interest. Douglas Campbell's trial counsel effectively cross-examined the child and demonstrated inconsistencies in his testimony. Trial counsel advanced multiple reasons W.R.A.'s allegations could not sustain a guilty verdict. Through Brent DeuPree, counsel offered evidence of an unsullied reputation and background of Campbell. Counsel introduced evidence suggesting an insufficient police investigation led police to arrest the wrong person. "Grandpa Al" or another individual

may have been involved. The defense presented, to the jury, testimony from Douglas and Cathy Campbell as to W.R.A.'s preoccupation with nudity and genitals. The jury could have inferred from this evidence that W.R.A. asserted his allegation in response to getting in trouble for trying to pull Campbell's towel from his body, something W.R.A. and Campbell were questioned about during trial. Through the aid of counsel, the jury heard experts testify that suggestibility by others tainted W.R.A.'s seemingly credible allegations.

The jury never knew that Douglas Campbell, through counsel, conceded credibility of W.R.A. during the child hearsay hearing. When conducting voir dire, counsel asked potential jurors a sound question: if W.R.A. appeared credible and caused an emotional tug, could each juror keep an open mind before hearing all of the evidence.

Conceding credibility of W.R.A. to a limited and tactical extent lies within the category of trial strategy to which we defer to counsel's decisions. Reviewing courts do not second guess concession strategies. *State v. Molina*, 16 Wn. App. 2d 908, 917, 485 P.3d 963 (2021). When arguing ineffective assistance of counsel, Douglas Campbell cites no legal authority establishing that defense counsel performs ineffectively by occasionally conceding the credibility of a credible seeming victim as a tactic for the counsel and his client to gain credibility with the jury.

*Child Hearsay Testimony*

Douglas Campbell argues that defense counsel provided ineffective assistance of counsel by failing to object to inadmissible child hearsay. When so arguing, Campbell cites no legal authority establishing that defense counsel performs ineffectively by conceding the credibility of the victim or by failing to object to the admission of child hearsay. Instead, he outlines instances when defense counsel attested to the credibility of W.R.A. and when defense counsel welcomed the admission of the child hearsay. He fails to explain, however, how these instances amount to deficient performance. He fails to criticize counsel's performance as a tactical error.

RAP 10.3(6) requires the argument section of an appeal brief to include "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." This court routinely declines to review issues when arguments lack citation to legal authority. *Helmbreck v. McPhee*, 15 Wn. App. 2d 41, 68, 476 P.3d 589 (2020); *Johnson v. Lake Cushman Maintenance Co.*, 5 Wn. App. 2d 765, 781, 425 P.3d 560 (2018); *Norcon Builders, LLC v. GMP Homes VG, LLC*, 161 Wn. App. 474, 486, 254 P.3d 835 (2011). We do so here.

Douglas Campbell may fault trial counsel for permitting W.R.A.'s parents to testify to statements uttered by W.R.A. when W.R.A. only told his parents what he told

Camela Davies was true. This argument may be accurate as to the father, Matthew Alverson. On this point, defense counsel effectively cross-examined Matthew. But W.R.A. directly told his mother, Lindsey Alverson, that Campbell touched his private parts.

## *Inconsistent Evidence*

Douglas Campbell argues that defense counsel provided ineffective assistance of counsel by presenting evidence of other incidents to show W.R.A. lacked boundaries and thereby lacked credibility in relation to those other incidents. According to Campbell, this introduction of evidence made no sense because it contradicted defense counsel's concession of W.R.A.'s credibility regarding the allegations against Campbell. We consider Campbell's contention to make no sense. As we reasoned above, counsel employed a wise tactic of indirectly challenging the credibility of W.R.A. by using W.R.A.'s other inconsistent statements and misbehavior. We will not second guess trial counsel's strategy even if the strategy loses.

## *Competing Investigation Strategy*

Douglas Campbell next argues that defense counsel provided ineffective assistance of counsel by employing a strategy that consisted of challenging the adequacy of the State's investigator and comparing the prosecution's investigator to the

investigator for the defense.  Yet again, he fails to cite to any legal authority to support this argument.  Campbell fails to show why this strategy lacked reason.

*Motions In Limine*

Douglas Campbell argues that defense counsel performed ineffectively by failing to object to the State's motion in limine prohibiting evidence on an alternative suspect. We reject this contention for many reasons.  First, Campbell fails to cite to the record when referring to the State's motion in limine and when referring to the trial court's ruling on the motion in limine.  Campbell needed to include citation to both the motion in limine and the court's ruling on the motion in limine pursuant to RAP 10.3(6).

Second, Douglas Campbell cites to *State v. Franklin,* 180 Wn.2d 371, 381-83, 325 P.3d 159 (2014), for the rule that Washington does not require direct evidence of another's guilt, but only circumstantial evidence tending to connect someone other than the defendant with the crime.  *Franklin* does not, however, establish that defense counsel performed deficiently by failing to object to the State's motion in limine preventing evidence of an alternative suspect and by failing to object to the trial court's ruling on the motion.

*Lack of Preparation*

Finally, Douglas Campbell argues that defense counsel performed ineffectively by

being unprepared, unfamiliar with the relevant legal process, and repeatedly making evidentiary errors. Our review of the record shows otherwise. Also, Campbell does not explain how any lack of preparation prejudiced his case.

## *Cumulative Error*

Douglas Campbell argues that the cumulative effect of the deficiencies in defense counsel's performance combined with other errors identified on appeal requires reversal. Even when individual error standing alone may otherwise be harmless, cumulative errors taken in total may produce a trial that is fundamentally unfair, and warrant reversal. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012); *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). Because no errors occurred, the cumulative error doctrine does not apply.

## *SSOSA*

The superior court denied Douglas Campbell's request for a SSOSA sentence. On appeal, Campbell contends that the court erred by denying his request on the impermissible basis that he denied guilt for the offense. We reject Campbell's assumption that the court primarily rejected the alternative sentence based on his denial of guilt and that rejection on this basis is necessarily impermissible.

RCW 9.94A.670 governs the issuance of a Special Sexual Offender Sentencing

Alternative. A SSOSA is a special procedure authorized by the Sentencing Reform Act,

RCW 9.94A of 1981 whereby a sentencing judge may suspend a sex offender's felony

sentence if the offender meets certain eligibility criteria defined in the statute. *State v.*

*Canfield*, 154 Wn.2d 698, 702, 116 P.3d 391 (2005); RCW 9.94A.670(2). If the trial

court determines the defendant is eligible for a SSOSA, the court, on its own motion or

the motion of the State or the offender, may order an examination to determine whether

the offender is amenable to treatment and the offender's relative risk to the community.

RCW 9.94A.670(3)(b).

RCW 9.9A.670(3)(a) outlines the information that must be included in the

examination report and demands that the examiner opine as to the offender's amenability

to treatment:

> (a) The report of the examination shall include at a minimum the
> following:
> (i) The offender's version of the facts and the official version of the
> facts;
> (ii) The offender's offense history;
> (iii) An assessment of problems in addition to alleged deviant
> behaviors;
> (iv) The offender's social and employment situation; and
> (v) Other evaluation measures used.
> The report shall set forth the sources of the examiner's information.
> (b) The examiner shall assess and report regarding the offender's
> amenability to treatment and relative risk to the community.

After reviewing the examination report, the sentencing court must decide whether

to grant the SSOSA based on factors listed in RCW 9.9A.670(4):

> (4) After receipt of the reports, the court shall consider whether the offender and the community will benefit from use of this alternative, consider whether the alternative is too lenient in light of the extent and circumstances of the offense, consider whether the offender has victims in addition to the victim of the offense, consider whether the offender is amenable to treatment, consider the risk the offender would present to the community, to the victim, or to persons of similar age and circumstances as the victim, and consider the victim's opinion whether the offender should receive a treatment disposition under this section. The court shall give great weight to the victim's opinion whether the offender should receive a treatment disposition under this section . . . The fact that the offender admits to his or her offense does not, by itself, constitute amenability to treatment.

The decision to grant or deny a SSOSA is discretionary with the trial court. *State v. Montgomery*, 105 Wn. App. 442, 444, 17 P.3d 1237 (2001). This court reviews such decisions for an abuse of discretion. *State v. Frazier*, 84 Wn. App. 752, 753, 930 P.2d 345 (1997). An abuse of discretion exists if the sentencing court categorically refuses to impose a particular sentence or if it denies a sentencing request on an impermissible basis. *State v. Osman*, 157 Wn. 2d 474, 482, 139 P.3d 334 (2006). Douglas Campbell promotes his denial of guilt as an impermissible basis.

This court's decision in *State v. Montgomery*, 105 Wn. App. 442 (2001) bears relevance. The sentencing court denied Steven Montgomery's petition for a SSOSA after his conviction for rape of a child and child molestation. The court concluded that

Montgomery was eligible for the alternative sentence but still denied the sentence because Montgomery made the victim to go to trial. The sentencing court reasoned that Montgomery's taking the case to trial indicated his unwillingness to acknowledge his problem and thus his lack of amenability to treatment. On appeal, this court held that Montgomery lacked eligibility for a SSOSA and affirmed the denial on this basis. Then, this court, in dicta, declared that the sentencing court denied Montgomery his constitutional right by denying the SSOSA based on causing his victim the trauma of a trial. The sentencing court thereby subjected Montgomery to more severe punishment for exercising his constitutional right to stand trial.

*State v. Montgomery* almost persuades us to reverse the superior court's denial of Douglas Campbell's request for a SSOSA but we distinguish *Montgomery* on two grounds. First, although the sentencing court in *Montgomery* mentioned a lack of amenability of Steven Montgomery, the sentencing court focused more on the child victim facing the ordeal of trial. Campbell's sentencing court made no mention of rejecting a SSOSA because of W.R.A. having faced trial or because of Campbell demanding trial. Instead, Campbell's sentencing court emphasized Campbell's continued denial of guilt after the jury verdict, something unmentioned in *State v. Montgomery*. Campbell's sentencing court did not express umbrage to Campbell exercising his right to

41

a trial but rather expressed concern of his attitude after trial. Campbell's posttrial attitude would impact his amenability to treatment, a key factor for consideration when addressing a potential SSOSA.

Second, Douglas Campbell's sentencing court based its denial of a SSOSA also on other factors. The sentencing court denied the alternative sentence because the sentence would be too lenient, W.R.A. opposed the issuance of a SSOSA, and neither the community nor Campbell would benefit from the SSOSA. Thus, we conclude the sentencing court did not abuse its discretion *when* denying a SSOSA.

CONCLUSION

We affirm the convictions and sentence of Douglas Campbell.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.P.T.

WE CONCUR:

_____          _____
Lawrence-Berrey, C.J.                     Murphy, J.